# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| FIRST FINANCIAL BANK, N.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  12-cv-1509 |
| | ) | |
| SCOTT BAUKNECHT and STATE | ) | |
| BANK OF GRAYMONT, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R   &   O P I N I O N

This matter is before the Court on cross-motions for summary judgment. Each of the three parties has filed a Motion for Summary Judgment, and each Motion is fully briefed. A discovery motion (Doc. 98) relating to evidentiary issues is also before the Court. For the reasons explained below, Plaintiff First Financial's Motion for Summary Judgment is granted in part with respect to Counts I, III, and IV and otherwise denied, Defendant Bauknecht's Motion for Summary Judgment is granted with respect to Counts V and VIII, granted in part with respect to Count IV, and otherwise denied, and Defendant State Bank of Graymont's ("Graymont") Motion for Summary Judgment is granted with respect to Counts VI, VII, and VIII, granted in part with respect to Count IV, and otherwise denied.  Graymont's discovery motion is granted in part and denied in part.

### PROCEDURAL HISTORY

Plaintiff filed the present case on December 13, 2012, bringing numerous claims relating to Defendant Scott Bauknecht's transition from employment with

Plaintiff to his subsequent employment with Defendant Graymont. Plaintiff brings eight claims: breach of contract against Defendant Bauknecht (Count I), breach of fiduciary duty against Defendant Bauknecht (Count II), misappropriation of trade secrets against both Defendants (Count III), conversion against both Defendants (Count IV), violation of the Federal Computer Fraud and Abuse Act against Defendant Bauknecht (Count V), tortious interference with contract against Defendant Graymont (Count VI), tortious interference with prospective economic advantage against both Defendants (Count VII), and civil conspiracy against both Defendants (Count VIII).

Defendants previously moved to dismiss, in part, Plaintiff's Complaint. These motions were granted in part and denied in part, pursuant to the Report and Recommendation by Magistrate Judge Cudmore, to which no objections were filed and which was thus adopted by the Court. (Doc. 25). As a result, Plaintiff's Count IV was limited to conversion of property that does not constitute trade secrets. (Doc. 25 at 2). No other claims were dismissed. After the discovery period, which included several discovery disputes, this matter now proceeds to summary judgment.

## DISCOVERY MOTION

After the close of discovery, Defendant Graymont filed a Motion to Overrule Objections and Allow Use of Answers and Admissions (Doc. 98). This Motion was filed under seal, because it contains extensive quotations from a deposition that contain some potentially confidential information. Because the ruling on this Motion can be given without describing any confidential information, it is contained herein and not under seal.

A deposition of Plaintiff's General Auditor Barry Stuck, pursuant to Federal Rule of Civil Procedure 30(b)(6), was taken on April 3, 2014. In response to several questions about Plaintiff's investigation and proof in this case, Plaintiff's counsel objected, primarily on the basis of work product. The answers in dispute are all subject to this objection, and many of the answers are accordingly specified by Plaintiff's counsel to be only based on Mr. Stuck's personal knowledge, not as a representative of Plaintiff.

At various times in the deposition, Defendant Graymont questioned Mr. Stuck about the proof Plaintiff had to prove its case and on what evidence Plaintiff was basing its claims. For example, Graymont asked what information and materials are being referenced in paragraph nineteen of the Complaint, which alleges the use of confidential information taken from Plaintiff under Count III. Mr. Stuck responded that he was only aware of one particular list of names. Graymont seeks to use this information as an admission that no other evidence supports Count III.

Under Rule 30(b)(6), a party may depose a corporation or other organization through a designated representative. This representative testifies on behalf of the organization about the identified topics. The work product doctrine protects from discovery documents and items prepared in anticipation of litigation by a party or its representative. Fed. R. Civ. P. 26(b)(3). The "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation" are specifically protected. Fed. R. Civ. P. 26(b)(3)(B). However, it does not protect the discovery of facts, only the legal theories drawn from the facts.

*S.E.C. v. Buntrock*, 217 F.R.D. 441, 446 (N.D. Ill. 2003) ("Such discovery clearly seeks not the facts, but the manner in which the SEC intends to marshal them.").

Defendant Graymont was not seeking to obtain any documents or items prepared in anticipation of litigation. Accordingly, the work product doctrine does not apply. But there is a somewhat related, unarticulated problem with the questions. The problem with Defendant Graymont's questions is not necessarily the information they were attempting to obtain, but Graymont's intended use of the answers. Graymont was trying to pin Plaintiff down to make admissions about its claims by questioning its representative about the facts in support.

Questions about legal theories or requiring the application of law are better answered through interrogatories. *See United States v. Taylor*, 166 F.R.D. 356, 362 n.7 *aff'd,* 166 F.R.D. 367 (M.D.N.C. 1996). "Whether a Rule 30(b)(6) deposition or a Rule 33(c) contention interrogatory is more appropriate will be a case by case factual determination." *Id.*

Here, the topics of Defendant Graymont's questions are more appropriate for contention interrogatories. They ask what evidence or facts were or will be used to support each of Plaintiff's claims. This is more appropriately done in the form of written interrogatories, as they are filtered through an attorney that is familiar with the case, the discovery, and the law. *See Beloit Liquidating Trust v. Century Indem. Co.*, 02 C 50037, 2003 WL 355743, *5-6 (N.D. Ill. Feb. 13, 2003) (concluding 30(b)(6) deposition topic of factual basis for claim more appropriate for written interrogatories). Mr. Stuck could not be expected to review the entirety of discovery productions and apply the law behind the various claims and reach a complete and

conclusive answer about what evidence supports which claims. Plaintiff's objection was geared toward preventing Graymont from doing what it correctly anticipated Graymont would do: try to limit Plaintiff's claims to the evidence known to Mr. Stuck. Defendant Graymont could have filed a contention interrogatory to obtain such information, but did not, and discovery has now closed. The Court finds that although Plaintiff's stated grounds for the objection were not entirely accurate, the end result is adequate. Mr. Stuck's testimony about the facts in support of the claims was limited to his personal knowledge, to avoid Defendant Graymont using them as evidentiary admissions. This is a happy medium, and requires no further relief from the Court.[1]

However, there is one line of questioning which is removed enough from an attempt to limit Plaintiff's proof, and based more on factual information, for which Plaintiff's objection is overruled. Defendant Graymont asked about the inspection or forensic examination that was conducted of Bauknecht's computer after he left his employment with Plaintiff. This is a reasonable line of questioning, not asked with respect to specific complaints or seeking to limit evidence Plaintiff could use to support its claims, but merely seeking facts. Defendant Graymont was entitled to answers from Plaintiff, as a corporate entity, as to the inspection of Bauknecht's computer after he left, and this is not work product or otherwise more appropriate to obtain through interrogatories. Accordingly, this objection is overruled. However, it is not clear that any further remedy is necessary at this stage, as Mr. Stuck

---

[1] In his Motion for Summary Judgment, Bauknecht attempts to limit Plaintiff's trade secret and conversion claims to evidence known by Stuck. Bauknecht, too, is prevented from relying upon Stuck's testimony as evidentiary admissions.

provided answers to the questions presented, and apparently even answered them as a corporate representative. Thus, Defendant Graymont's discovery-related motion is granted in part, and denied in part.

SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Cross-motions for summary judgment are considered separately, and each party requesting summary judgment must satisfy the above standard before

judgment will be granted in its favor. *See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Thus, the facts are construed in favor of the non-moving party, which differs depending on which motion is under consideration. *Tegtmeier*, 390 F.3d at 1045.

**FACTUAL BACKGROUND**[2]

Defendant Scott Bauknecht ("Bauknecht") began working for Pontiac National Bank ("PNB") in 1995. In 2006, the bank changed its name to Freestar, and Freestar eventually merged with Plaintiff First Financial Bank on December 30, 2011. At the time of this merger, Bauknecht was an Agricultural Loan Officer, as well as a Community Bank President.

*Bauknecht's Confidentiality Agreement and First Financial's Security Protocol*

While Bauknecht was employed with PNB, he received an employee handbook in February 1996. PNB had a policy of keeping information such as customer account information, financial data and personal information confidential. While it was called Freestar, the bank had a policy of forbidding employees from disclosing or using confidential customer information during or after employment. Freestar also required encryption of data copied onto laptops or other devices. On June 6, 2002, Bauknecht signed a Confidentiality Agreement with PNB, in which he

---

[2] Unless otherwise indicated, these background facts reflect the Court's determination of the undisputed facts, and are drawn from the parties' statements of facts and responses thereto. (Docs. 111, 127, 133). "Disputes" that facts are mischaracterized, or out of context, or not accurate descriptions of testimony, are not genuine disputes absent cited evidence to the contrary. Disputed facts are presented neutrally; inferences for one party or the other are discussed below when considering each Motion for Summary Judgment.

agreed not to disclose confidential customer information for a period of two years. Such information includes:

> all or any part of the Bank's customer accounts; customer financial records or related information; any existing or subsequently created customer or potential customer lists; . . . trade secrets . . . ; information regarding products and services offered by the Bank; and any other documents made, compiled, obtained or acquired by the Employee during employment concerning any customer or product or service offered by the Bank.

(Pl.'s Ex. 17, Doc. 109-7 at 1). To access financial information on Freestar's or Plaintiff's computers, the user must have the proper security codes.

On October 11, 2011, Bauknecht learned of the potential merger between Freestar and Plaintiff. The merger closed on December 30, 2011. Bauknecht retained his employment, in the same office.

*Bauknecht's Subsequent Employment with Graymont*

On either December 24 or December 31, 2011, Bauknecht spoke on the phone with Ronald Minnaert ("Minnaert"), president of Graymont, a competitor of Plaintiff. Bauknecht and Minnaert discussed the possibility that Bauknecht might work for Graymont, but the exact content and tone of the discussion is disputed. On January 10, 2012, Graymont's Board of Directors met, and voted to approve hiring Bauknecht as a loan officer. The nature of Bauknecht's acceptance of this offer is disputed, though no formal written offer or acceptance is on the record. On the weekend of January 21–22, 2012, Bauknecht went into the office at Plaintiff bank, and packed up his office. On that Monday, January 23, 2012, Bauknecht quit without giving prior notice to Plaintiff and signed employment paperwork with Graymont. Bauknecht's salary at Graymont is based upon his loan volume.

*Bauknecht's Transition to Graymont*

The parties dispute several details concerning Bauknecht's actions around the time of his transition from First Financial to Graymont. The following facts are undisputed.

After leaving his employment with Plaintiff, Plaintiff asked Bauknecht to return his keys and provide his voicemail password. At least twice, Bauknecht gave the wrong password. Bauknecht took with him soil maps, as well as farm equipment guides, upon leaving his employment. The soil maps were purchased by Bauknecht, but the farm equipment guides belong to Plaintiff and were returned to it at a deposition for this litigation.

On January 24, 2012, Bauknecht drafted a letter on Graymont letterhead that discussed his new employment at Graymont. Bauknecht wrote in his letter that his "clients will continue to come first," and told recipients, "[i]n the next couple of weeks I will be calling on you personally." He concluded with his contact information and a note that he "look[s] forward to serving your banking needs." (Pl.'s Ex. 13, Doc. 109-6 at 1). The letter was sent to seventy-three people, including many customers of Plaintiff's.[3] Minnaert personally reviewed and approved the sending of this letter.

---

[3] Graymont objects to Plaintiff's stated fact that sixty-one of the recipients had prior business with Plaintiff, and fifty-eight have accounts there, as Plaintiff cites to a large span of pages in a deposition for support. Bauknecht has similar complaints about this fact. However, the reason for the long span of pages is that the deposition testimony goes through each recipient individually and discusses whether each was a customer of Plaintiff's. Rather than listing each individual in separate facts, which would not be any less burdensome, Plaintiff conveniently condensed this into one fact. Graymont's objections are overruled.

After sending this letter, Bauknecht followed up with many of the recipients. About half of them called him directly, and he also called an additional twenty to thirty percent later. A number of the list's recipients, including customers of First Financial, moved their loans to Graymont, where Bauknecht handles approximately $20 million of the bank's $110 million loan portfolio.

In April 2012, Bauknecht created a document that listed several loans closed at Graymont through March 2012, four loans that were in the "pipeline" and expected to close by the end of 2012, and a list of about thirty individuals on his "calling list" that he intended to "continue to work on" in 2012. (Pl.'s Ex. 15, Doc. 111-10 at 1-2). This document notes that over $15 million in loans were "moved over" since Bauknecht began his employment with Graymont, and that they were the "low hanging fruit," anticipating that obtaining more loans would be more difficult. This document also identifies those customers who farm land managed by Plaintiff, which Bauknecht knew because of his former employment.

It is further undisputed that Bauknecht told Graymont the amount of money that one of Plaintiff's customers carried in its deposit accounts, or at least provided his best estimate of how much money the customer carried. He also told Graymont that the deposit account held money that was used to offset the cost of the customer's use of First Financial's Remote Deposit Capture.

The following facts remain in dispute. Defendants insist that Bauknecht created this list of seventy-three people to which to send the letter from memory after he left his employment with Plaintiff; Plaintiff has no evidence to the contrary, but suggests a jury could infer otherwise.

Plaintiff also suggests that Bauknecht obtained customer names and contact information from two additional documents: a document that it refers to as a "Master Database" and two lists of open loans.

There is another document, referred to by Plaintiff as a "Master Database." This list contains names of 615 individuals, and includes contact information for a portion of them, notes about them, and other miscellaneous data. (Pl.'s Ex. 8, Doc. 111-4). Bauknecht asserts that he stored the contact information for his friends, relatives, business acquaintances, professional and business service providers, and customers on his cell phone, and did so between 1995 and 2011. (Decl. of Scott Bauknecht, Doc. 104-1, at ¶3). The parties all dispute the origins of the master database and the manner in which Bauknecht obtained it.

Bauknecht also retained an iPad, given to him by Freestar, after his employment with Plaintiff ended. Freestar allowed its employees to use the iPads for personal use. Discovery revealed that Bauknecht's iPad contained two lists of open loans, one showing the loans Bauknecht serviced while employed by Plaintiff, and the other showing the loans managed by Plaintiff's junior loan officer, Dustin Smith. (Pl.'s Ex. 9, Doc. 111-5). Bauknecht transferred the documents to the iPad on January 9, 2012, and also sent it to his personal email account. Bauknecht claims this was approved by Plaintiff and that he transferred the documents in order to prepare for a meeting. Plaintiff claims that Bauknecht transferred the documents in an effort to poach customers.

Finally, both Bauknecht and Graymont had in their possession a number of Plaintiff's financial documents, including collateral schedules and financial

documents such as loan agreements and note modifications. It is undisputed that Bauknecht and Graymont obtained certain information through their customers. But the parties dispute the ways in which Defendants came into possession of other documents.

*First Financial's Losses*

It is undisputed that a number of Plaintiff's customers took their business to Graymont. The parties, however, dispute the reasons why this happened. Plaintiff argues that Defendants' misdeeds directly caused it to lose its business, but Defendants' argue that Plaintiff's declining reputation in the small community that it served, coupled with the ordinary business loss that accompanies the transition of employees, resulted in the loss.

DISCUSSION

As explained below, there are disputed facts that preclude judgment in favor of any party with respect to some of Plaintiff's claims. For others, there is no genuine dispute of material fact, and judgment may be awarded. The Court addresses each claim separately, below. First, a preliminary matter concerning an alleged admission is addressed.

**Bauknecht's Indemnification Letter**

Shortly after the initiation of this litigation, counsel for Bauknecht wrote a letter to counsel for Graymont. In this letter, Bauknecht's counsel states:

> All actions attributed to Bauknecht in the complaint were either known to or authorized by appropriate officers of the State Bank of Graymont. Accordingly, Bauknecht hereby makes demand upon Graymont to save, hold harmless and indemnify him for any and all damages that may accrue including without limitation, reasonable attorney's fees. Additionally, we request that you send to the

undersigned any and all insurance policies in force at the time of the
facts described in the complaint which may cover Bauknecht's actions
as an officer/employee of State Bank of Graymont . . . .

(Pl.'s Ex. 3, Doc. 111-2). This passage is nearly the entirety of the letter.

Plaintiff argues this letter, particularly the first sentence of the passage
recited above, should bring the litigation to an end, as both parties have thus
admitted every allegation in the Complaint. Such a reading is absurd as a factual
matter, and does not comport with the laws of evidence. In context, it is clear that
this statement, although very unfortunately worded, was not an admission that
everything alleged is true. Rather, it is an assertion that, to the extent Bauknecht is
found liable for any of the alleged actions, Graymont must be required to indemnify
him, because if he undertook the actions, they would have been approved by, or are
otherwise attributable to Graymont.

First, there are different types of admissions. "Judicial admissions are formal
concessions in the pleadings, or stipulations by a party or its counsel . . . ." *Keller v.
United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Such formal concessions
"must be deliberate, clear and unambiguous." *Robinson v. McNeil Consumer
Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) (internal quotation marks omitted).
Essentially all other types of party statements are simply evidentiary admissions,
and may thus be admissible evidence under Federal Rule of Evidence 801(d)(2). *See
Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996). The difference between
these two types of admissions is crucial, because judicial admissions are conclusive,
while evidentiary admissions can later be controverted or explained by the party.
*Keller*, 58 F.3d at 1198 n.8.

Bauknecht's statement in the letter at issue, through his counsel, is not a judicial admission. It was not made during any legal proceedings; rather, it was written in a letter to another attorney. It also is not a deliberate and unambiguous formal concession. However, as a statement made by Bauknecht's attorney, it is an evidentiary admission by a party opponent that would not be subject to a hearsay objection. Fed. R. Evid. 801(d)(2). As such, if admitted into evidence, it could still be contradicted, and thus is not dispositive of any issues in this case.

Bauknecht makes several arguments for why the contents of the letter should not be admissible as a judicial admission. As explained above, the Court has not adopted the statement as a judicial admission and is merely treating it as an evidentiary admission. Even so, the Court addresses Bauknecht's arguments in the event that they also apply to evidentiary admissions. First, he argues that this is not an admission because the word attribute or attribution does not mean admit or admission. That, of course, is true. But it does not mean that Bauknecht's statements were not evidentiary admissions. Under Bauknecht's argument, all admissions would need to begin with the magic words, "I admit." Here, First Financial relies upon a possible implication of Bauknecht's attorney's statement that if "all actions attributed to Bauknecht in the complaint were either known to or authorized by appropriate officers of the State Bank of Graymont" then those actions must have actually occurred. (*See* Pl.'s Ex. 2, Doc. 111-2).

Second, Bauknecht argues that the statement is a legal conclusion that Bauknecht was acting within his employment relationship with Graymont. It may well have been Bauknecht's attorney's intent to demand indemnification from

Bauknecht's employer. However, that is not the way in which First Financial is attempting to use the statement. Instead, First Financial is attempting to use the statement as evidence that Bauknecht engaged in the activities constituting the factual underpinnings of its complaint.

Third, Bauknecht argues that he never adopted or consented to the statement in the letter, although he was copied on it. However, there is no requirement in the federal rules that a party opponent adopt or consent to comments made by its agent or employee on a matter within the scope of that relationship. *See* Fed. R. Evid. 801(d)(2)(D). Here, Bauknecht's attorney wrote the letter on Bauknecht's behalf, and the letter concerned the matter in which Bauknecht had retained him. Therefore, the provisions of Rule 801(d)(2)(D), which pertain to admissions through an employee or agent, apply rather than the provisions of Rule 801(d)(2)(B), which pertain to admissions through adoption. *Cf. United States v. Jung*, 473 F.3d 837, 841 (7th Cir. 2007).

This is an evidentiary admission as to Bauknecht only. Plaintiff relies on Rule 801(d)(2)(B), and argues Graymont adopted this admission by failing to object to it and agreeing to indemnify Bauknecht. Plaintiff thus argues Graymont must have believed Bauknecht's statement was true because it agreed to the demanded indemnification. But that is not necessarily the case. Graymont's agreement to indemnify Bauknecht likely has nothing to do with whether Bauknecht acted as the Complaint alleges, and instead depends upon preexisting agreements between the two Defendants. Graymont did not adopt this admission. There was also no reason Graymont should have objected in any from to Bauknecht's statement.

Defendants also argue that this evidence, even if an evidentiary admission, should be inadmissible for other reasons. Bauknecht cites Rule 411, which prohibits use of insurance coverage as evidence to prove liability. That is not what Plaintiff is attempting to do; its focus is not on the existence of insurance, which is not even apparent from the letter, but on the statement concerning liability. The Court also sees no basis to exclude the statement under Rule 403 at this time. Accordingly, the statement is evidence, not weighed at the summary judgment stage, that supports Plaintiff's claim that Bauknecht is liable. As to Graymont, the statement is hearsay that may be inadmissible if used to prove that Graymont did authorize Bauknecht's actions; it thus is not used in that regard in ruling on the pending Motions.

### *First Financial's Eight Counts*

## I.     *Breach of Contract*

Plaintiff alleges Bauknecht breached the confidentiality agreement, and should be liable to it for breach of contract. The contract at issue is the Confidentiality Agreement Bauknecht signed on June 6, 2002, while an employee of PNB, Plaintiff's predecessor. Plaintiff cites five ways in which it claims Bauknecht breached this agreement. Bauknecht, in his Motion, argues he is entitled to judgment as a matter of law on this claim.

To prove a breach of contract, a plaintiff must prove the existence of an enforceable contract, performance by the plaintiff, breach by the defendant, and harm from the breach. *E.g.*, *Horwitz v. Sonnenschein Nath & Rosenthal LLP*, 926 N.E.2d 934, 942 (Ill. App. Ct. 2010).

*A. Bauknecht's Motion*

Bauknecht argues Plaintiff does not have standing to enforce the Confidentiality Agreement, because it was an agreement between Bauknecht and PNB, not with Plaintiff. It is undisputed that PNB changed its name to Freestar in 2006, and that Plaintiff and Freestar then merged in December 2011. The change in a corporation's name has no effect on its ability to enforce a contract. *See Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.,* 354 N.E.2d 904, 908 (Ill. App. Ct. 1976). Pursuant to Illinois law, the effect of a merger is that the surviving corporation "possess[es] all the rights, privileges, immunities, and franchises, as of a public or a private nature, of each of the merging or consolidating corporations," and all property, debts, and "all and every other interest" of the merging corporations are "deemed to be transferred to and vested in" the surviving corporation "without further act or deed." 805 Ill. Comp. Stat. 5/11.50(4).[4] Although Plaintiff cites no cases applying this provision to facts similar to the present case, it seems quite clear that Plaintiff, as the surviving corporation after its merger with Freestar, possessed all of Freestar's rights and interests, including those under the Confidentiality Agreement with Bauknecht. Freestar retained those rights despite its change in name from PNB since the contract was signed. Thus, even if the

---

[4] Neither party suggests that any law other than Illinois law should apply, and neither has briefed choice of law concerns. For that reason, the Court applies Illinois corporate law to this question. However, because First Financial is an Indiana Corporation, Indiana law may apply. Fortunately, the result is identical under the law of either jurisdiction. In Indiana, as in Illinois, title to property owned by each corporation that is party to the merger is vested in the surviving corporation. *See* Ind. Code Ann. § 23-1-40-6(a)(2). Because the laws of Illinois and Indiana are essentially the same on this issue, there is no need to conduct a choice-of-law analysis. *See Allianz Ins. Co. v. Guidant Corp.*, 869 N.E.2d 1042, 1049 (Ill. App. Ct. 2007).

Confidentiality Agreement was not specifically assigned by PNB to Freestar or Freestar to Plaintiff, Plaintiff is able to enforce its inherited rights under the Agreement as the surviving corporation after the merger.

Bauknecht also argues the contract is unenforceable because it contains no limit on the geography or duration of the requirement that Bauknecht not disclose confidential information. This argument is without merit for several reasons. While true that non-disclosure agreements without a geographical or durational limit may be unenforceable, *see Disher v. Fulgoni*, 464 N.E.2d 639, 644 (Ill. App. Ct. 1984), there was a duration limit of two years in the Confidentiality Agreement. Further, the lack of geographical or durational limits does not make a duty to maintain secrecy in a confidentiality agreement unenforceable, even if it is not limited specifically to protection of trade secrets. *See* 765 Ill. Comp. Stat. 1065/8(b)(1) ("[A] contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed void or unenforceable solely for lack of durational or geographical limitation on the duty."); *Coady v. Harpo, Inc.*, 719 N.E.2d 244, 250 (Ill. App. Ct. 1999).

Bauknecht makes two final arguments. He seems to argue that because the Confidentiality Agreement is only enforceable for two years following the end of employment, and his employment with PNB ended in 2006, the Agreement no longer restricted him from disclosing confidential information. He also argues that First Financial cannot enforce the contract because the limited time period for which he worked for First Financial cannot serve as adequate consideration for the agreement. For similar reasons to those given above, these argument also fail. PNB

changed its name to Freestar, and later merged with Plaintiff. Through this merger, Bauknecht retained his employment without notable change. His employment clearly ended, for purposes of the time limit on the restriction of disclosing confidential information, in January 2012. His alleged actions thus fell well within the two-year time period. He was also consistently employed by PNB or its successors since the day he signed the confidentiality agreement.

Bauknecht does not argue he did not disclose confidential information under the agreement as Plaintiff alleges. As his legal arguments against enforcement or applicability of the contract fail, he thus is not entitled to summary judgment on this claim.

### B. First Financial's Motion

In its motion, First Financial argues the undisputed facts demonstrate that Bauknecht breached the Confidentiality Agreement by disclosing to Graymont the identities of First Financial's customers and customer account information. Bauknecht does not challenge First Financial's assertion that he disclosed confidential information.

### 1. Breach

Pursuant to the Confidentiality Agreement, Bauknecht agreed that he would "hold in strict confidence and refrain from disclosing to others . . . confidential information . . . [which] shall include . . . customer financial records or related information; [and] any existing or subsequently created customer or potential customer lists . . ." (Pl.'s Ex. 17, Doc. 109-7, at 1).

Plaintiff argues that Bauknecht breached the agreement on five occasions: he created the list of 73 customers from memory, created a list of customers that he had moved to Graymont or planned to move to Graymont, took the master database of contact information, took the open loan documents, and told Graymont how much one customer kept in its deposit account. Plaintiff has not presented any evidence the Bauknecht shared the open loan documents with Graymont or that he shared the master database with Graymont. However, it is undisputed that both Bauknecht's list of 73 and his list of low hanging fruit include First Financial customers and it is also undisputed that Bauknecht specifically remembered certain people as First Financial's customers when he made this list. Further, Bauknecht does not dispute that he disclosed the size of a commercial customer's deposit account.

Each of these undisputed disclosures falls squarely within a category of information covered by the language of the confidentiality agreement. Therefore, the court finds that undisputed material evidence shows that Bauknecht breached his confidentiality agreement with First Financial. *See Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 217 (Ill. App. Ct. 1995); *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 785 (Ill. App. Ct. 2002)(noting that restrictive covenants limit former employees' rights to compete through solicitation of former customers).

### 2. *Damages*

However, First Financial has not presented undisputed evidence of damages. In support of its claim for damages, First Financial has provided a spreadsheet that

it claims "itemize[s] its lost profits to the penny on each of the loans it has lost because of Defendants' unlawful acts." (Doc. 109 at 47). The spreadsheet includes information regarding 46 loans taken out by 28 customers who moved their loans from First Financial to Graymont. First Financial claims that the spreadsheet is a summary of over 500 pages of loan documents. It uses those data points to calculate lost profits.

This document is inadmissible for this purpose. A party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. In *United States v. White*, the Seventh Circuit held that a spreadsheet that included information regarding 236 property sale transactions was properly admitted under Rule 1006. 737 F.3d 1121, 1135 (7th Cir. 2013). However, a party introducing such evidence "must not misrepresent [the underlying documents'] contents or make arguments about the inferences the jury should draw from them." *Id*. In *White*, the spreadsheet "catalogued instances of objective characteristics" about the mortgage transactions, including identities of people who had provided down payments, whether buyers had purchased multiple properties within a short period of time, buyers' listed employers, and identities of loan officers. *See id*. at 1134-35. From there, the spreadsheet "added [the instances of these objective occurrences] together," to create totals. *Id*. at 1135.

In this case, Plaintiff's spreadsheet is inadmissible under Rule 1006 because it relies upon a number of inferences that a jury could draw and that the Plaintiff

has tacitly already made for the factfinder. *See id.* at 1135. Rather than serving as a catalogue of "objective characteristics," the spreadsheet is pure argument. *See id.*

First, Plaintiff relies upon an improper inference in selecting the universe of loan documents from which it draws the data to populate the spreadsheet. It takes for granted that it lost each of these loans to Graymont because of Bauknecht's breach. Evidence produced by Defendants—as well as common sense—dictates that this cannot simply be assumed true. For instance, a number of the borrowers listed on First Financial's damages spreadsheet were not even included in Bauknecht's List of 73. (*Compare* Pl.'s Ex 18, Doc. 111-13, *with* Pl.'s Ex. 14, Doc. 111-9). The list's unreliability is also demonstrated by the fact that Plaintiff includes entries for Bauknecht's relatives. (*See, e.g.*, Pl.'s Ex. 18, Doc. 111-13; Pl's Ex. 1, Doc. 111-1, at 138). They could have been motivated to move loans by many reasons, including simply receiving news of their relative's new employer. Finally, Defendants have produced evidence that a number of First Financial's customers brought their business to Graymont for reasons entirely independent of Bauknecht's solicitation. A reasonable jury could believe that some or all of First Financial's damages were self-inflicted or not otherwise attributable to Bauknecht.

Second, Plaintiff's actual calculations of lost profits rely upon unverified inferences that should be left for a jury to draw. Imbedded in this spreadsheet is the assumption that borrowers regularly wait until the contractual maturity date to repay their loans and never make partial or full prepayments in the absence of the malfeasance of a competitor. It may be true that the spreadsheet accurately catalogues data points contained in loan files such as the dates when the customers

prepaid their loans with Plaintiff, but the cause for such prepayment cannot be assumed and definitely cannot be relied upon as an objective fact. Unfortunately, Plaintiff uses those data points, which are based upon faulty assumptions, to calculate the amount of projected income it lost in the form of interest payments. Such a calculation is an inference that does not take into consideration the myriad contingencies of life and business.

Plaintiff's Chief Financial Officer Roger McHargue testified that he calculated lost interest income by looking to the number of days between loans' contractual maturity dates and the days on which they were actually paid off. (Pl.'s Ex. 28, Doc. 131-4, at 154). For example, if a loan has a maturity date of January 1, 2015 but the borrower will pay it off on December 1, 2014, there would be 31 days between the contractual maturity date and the payoff date. On each of these days, a bank would lose interest payments it would receive if the borrower waited to pay the balance until the loan's maturity date. Again, there cannot be any underlying data point contained in the range of produced documents that establishes, as an objective fact, that those borrowers would have waited until the contractual maturity date to fully repay their loans. *See White*, 737 F.3d at 1135.

Both the criteria used to select loans on the spreadsheet – the fact that those customers moved from First Financial to Graymont – and the calculations used to assess damages are based upon inferences and assumption. Therefore, the

spreadsheet is inadmissible as substantive evidence under Rule 1006. *See* Fed. R. Evid. 1006; *White*, 737 F.3d at 1135.[5]

First Financial's next argument is that the Court must accept its damages calculations because neither Defendant has disclosed how much money Graymont has made on those loans. In making this point, it relies upon an unpublished case brought by a company that lost an exclusive distribution contract after its consultants shared trade secrets with a competitor. *See Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605 (N.D. Ill. Apr. 28, 2003). In *Lucini Italia*, the Court credited the plaintiff's damages forecast, noting that "specific and certain proof of the actual amount of losses is not required" when "a defendant's unlawful act keeps a plaintiff out of a market." *Id.* at *19. The court drew the inference that the defendants' sales and profits, if disclosed, would support the plaintiff's damage calculations. *Id. Lucini Italia* is inapposite. There, the defendant attempted to eliminate competition by completely shutting the plaintiff out of the market. *Id.* In this case, however, Graymont and First Financial remain competitors in the same market space. There is nothing keeping First Financial from trying to take back its prior customers. *See id.* Therefore, it would be inappropriate to draw the same inference from the facts presented here that the court drew in *Lucini Italia*.

For these reasons, the Court denies Bauknecht's motion for summary judgment on Count I. First Financial has established that Bauknecht breached his confidentiality agreement, and summary judgment is therefore granted on the issue

---

[5] However, as explained in *White*, with the proper foundation the spreadsheet may be admissible under Rule 611(a) as a pedagogical chart. *See* 737 F3d at 1135-36.

of liability alone, but not damages. There is a genuine issue of material facts as to damages that a jury must resolve.

## II.     *Breach of Fiduciary Duty*

Plaintiff alleges Bauknecht breached his fiduciary duty of loyalty in five ways: (1) using Plaintiff's computer system to create the master database of customers that he later used to compete against Plaintiff; (2) conducting targeted inquiries into Plaintiff's customer's loans so he could bring that information and deposit account information to Graymont; (3) stealing bank property from Plaintiff; (4) denying Plaintiff access to his work phone, which he used to compete against Plaintiff even before he resigned; and (5) coordinating with Graymont about moving over Plaintiff's loans. Both First Financial and Bauknecht have moved for summary judgment on Count II. For the reasons discussed below, the existence of disputed material facts precludes summary judgment for either party.

In order to prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) a fiduciary duty exists, (2) the fiduciary duty was breached, and (3) such breach proximately caused plaintiff's injury. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000).

Under Illinois law, an employee owes a fiduciary duty of loyalty to his employer. *Lawlor v. N. Am. Corp. of Illinois*, 983 N.E.2d 414, 433 (Ill. 2012); *Mullaney, Wells & Co. v. Savage*, 402 N.E.2d 574, 580 (Ill. 1980). Employees, however, "may compete with their former employer and solicit former customers so long as there was no demonstrable business activity by the former employee before the termination of employment." *Id.* Employees breach their fiduciary duty when

they take action, such as downloading or copying employer data, in order to compete with the employer after their employment has ended. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001). This includes, for example, improperly taking customer lists. *Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1059 (Ill. App. Ct. 1993).

In his motion, Bauknecht argues that he did not owe Plaintiff a fiduciary duty of loyalty because he was not Plaintiff's officer. Although corporate officers' fiduciary duties of loyalty are broader than those of non-officer employees, and thus subject officers to liability for a greater range of infidelities, *Veco Corp.*, 611 N.E.2d at 1059, all employees, regardless of title, owe their employers a duty of loyalty. *See Lawlor*, 983 N.E.2d at 433. It is undisputed that Bauknecht was First Financial's employee, thus he cannot escape liability on the basis that he was not Plaintiff's officer. Bauknecht's motion for summary judgment is based upon this fundamental misunderstanding of Illinois law, and is therefore denied.

Plaintiff's motion is also denied, as Bauknecht's alleged breach of his fiduciary duty turns on disputed facts. Plaintiff claims that Bauknecht "'min[ed] its databases and computers for loan terms, download[ed] customer lists and other financial documents to a Bank-issued iPad, stor[ed] customer information on his bank-issued smart phone, [and] email[ed] highly confidential 'Open Loan' documents and additional customer lists to his private email account from work," all while he was negotiating an employment agreement with Graymont. (Doc. 109 at 33). Based on the proximity of these events, a reasonable jury could infer that Bauknecht breached his fiduciary duty because he undertook these actions in order

to compete against Plaintiff after his employment ended. *See RKI, Inc.*, 177 F. Supp. 2d at 877.

However, Bauknecht has introduced evidence that he undertook each of these actions for reasons independent of competition with Plaintiff. For example, he testified in his deposition that he looked up customers out of concern for Plaintiff's business. (*See* Pl.'s Ex. 1, Doc. 111-1, at 288 ("I had concerns that if many farmers paid down right after the first of the year, that would decrease the size of the bank")). He testified that the customer lists remained on his iPad in spite of his efforts to remove them from it. (*Id.* at 245-46). And he testified that he emailed the two confidential open loans documents from his work email account to his private email account in order to prepare for a First Financial meeting and at the instruction of Plaintiff's IT department. (*Id.* at 261).

Because a reasonable jury could credit Bauknecht's reasons for engaging in this behavior, granting judgment on Plaintiff's fiduciary duty claim is premature, since there is a genuine dispute as to the material facts. Plaintiff's motion with respect its fiduciary duty claim is denied.

## III. *Illinois Trade Secrets Act*

Plaintiff alleges that both Bauknecht and Graymont misappropriated its trade secrets, including customer lists and account information, in violation of the Illinois Trade Secrets Act (ITSA). Under the ITSA, a person is entitled to recover damage for the misappropriation of trade secrets. 765 Ill. Comp. Stat. 1065/4. To establish a violation, a plaintiff must show that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the

misappropriation damaged the trade secret's owner. *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005); 765 Ill. Comp. Stat. 1065/2.

Plaintiff's ITSA claim involves a variety of customer lists and financial information, including (1) the list of 73 customers that was created by Bauknecht when he moved to First Financial and served as a mailing list for his letter announcing his new employment; (2) the master database of all of Bauknecht's contacts which he created while he was employed by First Financial, a fraction of which include Bauknecht's First Financial clients; (3) a list of low hanging fruit identifying Bauknecht's early successes and future challenges in bringing clients to Graymont; (4) lists of open loans held by First Financial clients of Bauknecht and Dustin Smith that included the customer's name, the note's origination date and maturity date, the principal balance, and the available line of credit; and (5) the disclosed deposit information of one customer. The gist of First Financial's claim is the identities of its customers and their financial needs are economically valuable to its competitors, not generally known to its competitors, were protected by its confidentiality policy and other procedures, and were improperly used by Defendants in order to target potential customers.

Each party has moved for summary judgment on Count III. The Court concludes that First Financial's customer lists and financial information constitute trade secrets under the ITSA, and also concludes that Bauknecht misappropriated them when he moved from First Financial to Graymont. The issues of Graymont's liability and damages are disputed, and must be determined by a trier of fact.

### A.  Trade Secret

The ITSA defines a trade secret as "information, including but not limited to . . . [a] list of actual or potential customers" that "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 Ill. Comp. Stat. 1065/2(d). Plaintiff has produced undisputed evidence sufficient to show that the customer lists and financial information are secret and economically valuable and that it took reasonable steps to keep the information confidential.

### 1. Sufficient Secrecy

The first issue is whether the allegedly misappropriated information is sufficiently secret to derive economic value. Plaintiff claims that it is, relying upon the circular argument that Defendants would not have taken the information if it did not have value. Defendants argue that it is not because such information is readily available in public sources. The Court finds that First Financial's open loan lists are sufficiently secret to derive economic value.

Under appropriate circumstances, a list of actual or potential customers may qualify as a trade secret, but such a determination turns on the facts of a case. *Multitut Corp. v. Draiman*, 834 N.E.2d 43, 50 (Ill. App. Ct. 2005). Protection reflects "a balancing of conflicting social and economic interests," in which employers should be able to protect trade secrets into which they have "invested substantial time, money, and effort" but employees in competitive markets "must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his

chosen occupation." *Delta Med. Sys. v. Mid-America Med. Sys., Inc.*, 772 N.E.2d 768, 780 (2002).

Illinois courts have used demanding language to describe the threshold showing needed for customer lists to qualify as sufficiently secret, sometimes requiring that plaintiffs show they have "developed the information over a number of years, at great expense, and kept the information under lock and key." *Am. Wheel & Eng'g Co. v. Dana Molded Prods., Inc.*, 476 N.E.2d 1291, 1295 (Ill. App. Ct. 1985). Courts have also turned their focus to "the ease with which information can be readily duplicated without involving considerable time, effort, or expense." *Stampede Tool*, 651 N.E.2d at 215. In many cases, courts do both. *See, e.g., Delta Med. Sys.,* 772 N.E.2d at 781 (holding the trial court abused its discretion when it concluded that a mammography equipment dealer's customer list was a trade secret because the company "presented no [evidence] . . . as to the amount of effort expended in acquiring its customer list," which could "be duplicated with little effort" by "merely looking in the yellow pages or from a FOIA request"); *Stampede Tool*, 651 N.E.2d at 215-16 (holding that a tool distributor established that its customer list was sufficiently secret because it would have cost a great deal of time and effort to recreate it, and it required a substantial amount of time, effort, and expense to develop). Both factors need not be present if a list is developed through relationships. In *Liebert Corp. v. Mazur*, the court concluded that a computer network protection company's customer list was sufficiently secret because it required "discovering and developing relationships with appropriate buyers," an undertaking conducted over a span of thirty-five years. 827 N.E.2d 909, 923 (Ill.

App. Ct. 2005). This value-added was sufficient to accord the list trade secret status in spite of the fact that a competitor could find the identity of all of its customers in an online industry directory. *Id.*

Without the value-added of developed relationships, however, courts decline to accord trade secret status when customer lists are readily reproducible. For example, in *Hamer Holding Group, Inc. v. Elmore*, the court held that a customer list comprised of non-profit organizations was not a trade secret because it was simply distilled from a publicly available list held by the Illinois Secretary of State. 560 N.E.2d 907, 1011 (Ill. App. Ct. 1990). Even though the court acknowledged that distilling names from the list was costly, it concluded that "anyone having access to the Secretary's information could have easily duplicated the same process of 'distillation.'" *Id.*

This is especially true in industries where potential customers are easily identifiable because of broad and non-specific needs. For example, in *Carbonic Fire Extinguishers Inc. v. Heath*, the court held that customer lists and pricing information were not trade secrets for a business that serviced fire extinguishers and cleaned restaurant hoods because the service is commonly used by most restaurants. 547 N.E.2d 675, 677 (Ill. App. Ct. 1989). Therefore, the court reasoned that any potential competitor could easily compile a list of potential customers that included the plaintiff's customers "simply by contacting restaurants through the telephone directory." *Id.* More recently, in *System Development Services, Inc. v. Haarmann*, the court held that a computer network services company's customer list was not a trade secret because "computers and computer networks are common

business tools. . . [and] [l]ocating potential customers is merely a matter of identifying businesses in a particular . . . area and looking up their contact information." 907 N.E.2d 63, 75 (Ill. App. Ct. 2009). There, because the customer list was simply a list of names, addresses, and telephone numbers that was not differentiated by business type, the court concluded that the plaintiff was trying to protect a list that was "susceptible to common knowledge." *Id.* at 76. Such customer lists are distinct from customer lists developed by businesses that serve diffuse customers that have particular needs. *See, e.g., Elmer Miller, Inc. v. Landis*, 625 N.E.2d 338, 342 (Ill. App. Ct. 1993) (granting trade secret status to a custom tailor's customer list).

Although the evidence that Plaintiff has provided is limited, the customer lists are sufficiently secret to derive economic value. Plaintiff has not provided any evidence as to the cost of development of its customer list. *See Am. Wheel & Eng'g Co.*, 476 N.E.2d at 1295. However, Plaintiff has provided undisputed, but thin, evidence that identifying and developing customers does take effort. *See Stampede Tool*, 651 N.E.2d at 215. First, Plaintiff has presented undisputed evidence that developing banking customers requires building relationships with them. Bauknecht himself affirmed the importance of relationships in his letter announcing his move to Graymont, writing, "At the State Bank of Graymont, my clients will continue to come first and loan decisions will be made by people who know you and know how you operate your business . . . Your financial needs will always be put first." (Pl.'s Ex. 13, Doc. 109-6). And he admitted in his deposition that relationships are important, take years and hard work to maintain, and First

Financial Bank and Freestar Bank were "all about relationships." (Pl.'s Ex. 1, Doc. 111-1, at 27). Therefore, First Financial's customer list resembles the list in *Liebert Corporation*, which was sufficiently secret and built through "discovering and developing relationships with appropriate buyers." 827 N.E.2d at 923. *See also Stampede Tool*, 651 N.E.2d at 216 (discussing the importance of relationships in prospecting).

Further, evidence tends to show that First Financial's customer list could not be duplicated with little effort. *See Delta Medical Sys.*, 772 N.E.2d at 792. Defendants argue that Bauknecht created his customer lists easily, simply through his memory and with a phone book. But this argument does not speak to how easy it might be to recreate the list without prior knowledge of its contents. Both Plaintiff and Bauknecht agree that "obtaining agricultural borrower names would require an individual to go to a courthouse with a name and look up mortgages one-by-one." (Doc. 109 at 20; Doc. 116 at 9). And, unlike in *Carbonic Fire Extinguishers*, 547 N.E.2d at 677, where the customer list could be reproduced by reference to business listings, and in *System Development Services*, 907 N.E.2d at 75, where the list could be reproduced by identifying all businesses in a geographic area, here two parties agree that reproducing a list of borrowers would require already knowing the identity of potential borrowers. Graymont disputes this fact, and provides evidence that competitors could obtain customer identities' and financial information by reviewing reports prepared by a third-party service, reviewing state Uniform Commercial Code filings, and reviewing USDA payments. (Graymont Ex. 2, Doc. 106-4, at 25-26). Even so, Minnaert testified that with that information, a

person still would not be able to identify all customers or identify a bank's largest customers. (*Id.* at 29).

Finally, Plaintiff's customers have tailored and unique needs. Information present in the open loans documents, including loan origination dates, loan maturity dates, loan amounts, and available credit, is helpful in identifying the particular financial needs that individual clients have. *Compare Elmer Miller*, 625 N.E.2d at 342 *with Carbonic Fire Extinguishers, Inc.*, 547 N.E.2d at 677. As Graymont's corporate representative testified, there is value in this information that is not publically available. Even if Graymont could have identified each of the customers through publicly available sources, Bauknecht's relationships and unique knowledge of their specific financial needs provided additional economic value. *See Liebert Corp. v. Mazur*, 827 N.E.2d at 923.

### 2. *Reasonable Efforts to Maintain Secrecy or Confidentiality*

In determining whether a customer list is a trade secret, the manner in which an employer maintains its confidentiality is the most important factor. *Alpha School Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1152 (Ill. App. Ct. 2009). The determination of "[w]hether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury." *Learning Curve Toys, Inc. v. Play Wood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003). However where, as here, Plaintiff has provided ample evidence of measures that it took to secure its confidential information, summary judgment is appropriate. Plaintiff has presented undisputed evidence that it took the types of precautions that Illinois courts have considered reasonable, and Defendants have

responded by presenting evidence that Plaintiff's confidential information remained unsecured in spite of these precautions. Defendants' evidence does not create a genuine factual dispute as to the reasonableness of Plaintiff's efforts to keep its customer lists confidential.

Illinois courts have looked to a variety of factors in assessing the reasonableness of security measures taken by plaintiffs, including whether a plaintiff implemented efforts to keep confidential information secure, informed employees of the information's confidential value, and required non-disclosure agreements. Nondisclosure agreements, such as the confidentiality agreement that Bauknecht signed, are important evidence of reasonable steps. *See Liebert Corp.*, 827 N.E.2d at 923-24. However, confidentiality agreements alone are not sufficient to meet the reasonableness standard. *See Arcor v. Haas*, 842 N.E.2d 265, 271 (Ill. App. Ct. 2005) (holding trial court abused its discretion in granting a preliminary injunction when trade secret holder relied solely on a confidentiality agreement to protect its information). Rather, Illinois decisions suggest that employers must show employee understanding of confidentiality. *See Gillis Associated Indus. v. Cari-All, Inc.*, 564 N.E.2d 881, 886 (Ill. App. Ct. 1990) (suggesting plaintiff could show reasonable measures taken by demonstrating "employees *understood* that lists were to be kept confidential"); *Liebert Corp.*, 824 N.E.2d 909, 923-24 (noting that in the absence of a confidentiality agreement, plaintiff must "show, at a minimum, that its employees *understood* he information was to be kept confidential.").

In this case, the parties do not dispute that Bauknecht understood that the customer information was confidential. And it is undisputed that Bauknecht signed

a confidentiality agreement that covered customer information while employed by First Financial's predecessor. Therefore, Plaintiff has provided sufficient evidence to survive Defendants' summary judgment motion on this ground. *See, e.g., Gillis*, 564 N.E.2d at 886.

Plaintiff has provided further evidence that it took reasonable steps, pointing to measures that it took to keep its documents secure. Specifically, it has presented evidence that employees needed security codes to access its computer system and it has presented evidence that employees were instructed in how to remove confidential information from personal iPads. In *Stampede Tool*, the court held that the company's customer list was reasonably confidential because, among other things, the company limited computer access to two key employees, provided customer information to others on a need-to-know basis, kept all hard copies of the customer list in an office under lock-and-key, and prohibited salespeople from removing customer information from that office. 651 N.E.2d at 216. And in *Elmer Miller*, the court held that a small company took reasonable measures to protect its customer lists confidentiality by keeping it in "a closed file drawer" and informing its employees that the list was confidential. 625 N.E.2d at 342. In this case, in addition to employing confidentiality agreements and promoting employee understanding that certain information such as customer lists and financial information was to be kept confidential, Plaintiff took steps to protect the integrity of its computer systems by limiting access to those with company-provided access codes constituted a reasonable step to keep its information confidential.

These steps are reasonable as a matter of law. The fact that Bauknecht, as Plaintiff's trusted employee, operated outside the limits of certain policies does not call this reasonableness into question. Defendants have produced evidence that Plaintiff could have done more, and actually left its customer lists and financial information rather exposed. They argue that Plaintiff failed to reasonably restrict access to its confidential information in a number of ways. First, Bauknecht was permitted to use his iPad for personal use and Plaintiff failed to inspect it to determine whether it contained confidential data. Second, Plaintiff's IT staff advised Bauknecht that he could email confidential information to his personal account and also advised Bauknecht to back up his contact list (which included bank customers) onto his own thumb drive. Third, Plaintiff failed to limit Bauknecht's access to Dustin Smith's loan list.

These purported failures are all legally insufficient to allow a reasonable jury to find that Plaintiff had failed to take reasonable measures sufficient to warrant trade secret status to its customer list and related financial information. The failure to totally secure confidential information from every conceivable risk of disclosure by an employee entrusted with such information in furtherance of his job duties is not the sine qua non of reasonable protective measures. Perhaps in retrospect Plaintiffs could have done more to make it difficult for an employee such as Bauknecht to make use of confidential information available to him in furtherance of his job duties. However when reasonable measures have been taken, the law does not require additional measures adequate to forestall an unanticipated situation like the one presented by Bauknecht. In this case, Plaintiff had a confidentiality

agreement in place, employees generally understood that such information covered by the agreement was confidential, employees needed security codes to access Plaintiff's system, and Plaintiff had policies in place requiring that employees encrypt data before moving or copying it onto electronic media such as laptops and USB storage devices.

Despite the fact that Plaintiff's employees allowed Bauknecht to possess confidential information outside of these measures does not vitiate the reasonableness of the measures instituted to protect the security of the confidential information. The existence of confidentiality agreement is premised on the assumption that as the employee's job responsibilities will of necessity give him access to confidential or secret information. Baukencht's access to Dustin Smith's loan list was premised on the same restrictions and requirements that governed access to his own loan list. *See Stampede Tool*, 651 N.E.2d at 216; *Elmer Miller, Inc.*, 625 N.E.2d at 342. Failing to inspect Bauknecht's iPad and by permitting him to email confidential documents to his personal email account may mean that Plaintiff's documents were not perfectly secured, but Plaintiff continued to limit access to confidential documents and monitor access to hard and electronic copies by requiring security codes to access its computers. *See Liebert*, 827 N.E.2d at 923-24.

There are no material factual disputes concerning the sufficiently secret nature of First Financial's customer lists and the reasonableness of the steps First Financial took to keep the information secure. Therefore, the Court concludes that First Financial's customer lists and customer financial information qualify as trade secrets under the ITSA.

### B. Misappropriation

The second element that a plaintiff must prove is that defendants misappropriated the trade secret. The ITSA provides that a plaintiff can show misappropriation through improper acquisition, unauthorized disclosure, or unauthorized use of trade secrets. 765 Ill. Comp. Stat. 1065/2(b).

#### 1. Bauknecht's Misappropriation

First Financial argues that Bauknecht used its trade secrets when he created the list of 73 and his solicitation letter. It also argues that he used its trade secrets when he created the low hanging fruit list, and when told Graymont how much a key commercial customer kept in a deposit account.

A reasonable jury could not help but find that First Financial's financial information, such as information about how much customers keep in their bank accounts, qualifies as a trade secret. Therefore, there is little doubt that Bauknecht misappropriated the information by disclosing it to Graymont. *See* 765 Ill. Comp. Stat. 1065/2(b)(2) ("'Misappropriation' means . . . disclosure or use of a trade secret of a person without express consent by another person who . . . used improper means to acquire knowledge of the trade secret.") ; *Id.* at 1065/2(a) ("'Improper means' includes . . . breach . . . of a confidential relationship or other duty to maintain secrecy or limit use.").

Furthermore, there is undisputed evidence that Bauknecht misappropriated First Financial's customer lists. It is true that Bauknecht has provided seemingly innocuous reasons for possessing both the open loan documents and the master database, both of which are unrelated to the creation of the list of 73 or the low

hanging fruit list. Bauknecht argues that he possessed the master database because it was his own personal contact list and because a First Financial employee instructed him to download it to a thumb drive. Bauknecht also argues that he possessed the open loan documents because he needed them to prepare for a First Financial meeting that he attended before leaving for Graymont. Bauknecht argues that he did not rely upon either in creating the list of 73 on his first day at Graymont, and that he instead relied upon his memory and a phone book.

A reasonable jury could believe Bauknecht and conclude that he did not rely upon either the open loan documents or the master database, and instead created his mailing list at Graymont entirely through memory. However, no reasonable jury could find that Bauknecht's actions do not constitute misappropriation of First Financial's customer lists.

Bauknecht admitted during his deposition that he created the list of 73 by remembering the names of his past customers and his former colleague Dustin Smith's customers. Memorization is one manner in which a trade secret may be misappropriated. *See Televation Telecommunication Sys. v. Saindon*, 522 N.E.2d 1359, 1363 (Ill. App. Ct. 1988) (noting that it is irrelevant as a matter of law whether a defendant took copies of a trade secret or memorized them). Evidence that a defendant has remembered names of customers is sufficient to establish memorization. *See Stampede Tool*, 651 N.E.2d at 216. In *Stampede Tool*, the court did not disturb the lower court's finding that the defendant intentionally memorized customer lists on the basis of testimony that he "obtained their telephone numbers from directory assistance or telephone books" after "remembering their names and

locations . . . because he worked with them over some period of time." *Id.* at 212, 217.

Bauknecht admitted to doing exactly that in his deposition testimony. Although he provided personal reasons for soliciting a number of former customers he had at First Financial,[6] he also simply acknowledged that he remembered a great number of the people that he solicited as his customers or Dustin Smith's customers.[7] He testified that he knew the names "from memory mostly . . . [b]ut I was able to open up a phone book and go down alphabetically, and these aren't uncommon names in the phone book. . . And that just kind of jogged my – jogged my memory." (Pl.'s Ex. 1, Doc. 111-1, at 190).

As in *Stampede Tool*, Bauknecht testified that he remembered customers' names and then cross-referenced a telephone directory. *See* 651 N.E.2d at. at 217. And, there is substantial overlap between the customers included on the list of 73 and the customers included on the open loan documents. (*Compare* Pl.'s Ex. 14, Doc. 111-9, *with* Pl.'s Ex. 9, Doc. 111-5). This goes beyond competing with former employers by soliciting former customers, because Bauknecht improperly took a

---

[6] For example, Bauknecht testified that he knew one former customer because "[his] father is my godfather," they grew up together, and their kids play on a baseball team together. (Pl.'s Ex. 1, Doc. 111-1, at 137). He also testified that he knew another former customer because, "[He] has provided labor for me if I – on the farm side of things also. When I have to scoop out a bed of corn or something to that effect, I usually call [him] up, and [he] and I will do it together." (*Id.* at 146). Other former customers from First Financial were his close relatives. (*See, e.g., id.*at 139, 157)).

[7] For example, he testified that a number of people he solicited were already at First Financial's predecessor when he arrived in the mid-1990s. (*See, e.g.,* Pl.'s Ex. 1, Doc. 111-1, at 161). Others he "inherited" from a former loan officer. (*See, e.g.*, *id.* at 163, 177). And Dustin Smith was the loan officer for others. (*See, e.g., id.* at 156 (testifying, "I was not directly a loan officer for them. I guess this loan was handled by Dustin Smith.")).

customer list through memorization in order to compete.[8] *See Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 785 (Ill. App. Ct. 2002).

### 2.     *Graymont's Misappropriation*

A third party can be liable for the misappropriation of a trade secret when it knows or has reason to know that the trade secret was acquired by improper means or obtained in violation of a duty of confidence owed to the trade secret owner. *See* 765 Ill. Comp. Stat. 1065/2(b)(2)(B). Courts have held that third parties can be liable when they have actual knowledge of misappropriation or have constructive knowledge of misappropriation. *See, e.g., RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 868-69 (N.D. Ill. 2001) (holding that a third party had actual knowledge that new employee held competitor's trade secrets when employee informed it that it possessed customer lists and it required employee to sign an indemnification agreement protecting it); *C&F Packing Co., Inc. v. IBP, Inc.*, No. 93 C 1601, 1998 WL 1147139, at *6-7 (N.D. Ill. Mar. 16, 1998) (holding that a third-party had

---

[8] For the same reasons, a reasonable jury could discredit Bauknecht's testimony and conclude that he did in fact misappropriate the customer lists by purposely taking digital copies of customer lists. Plaintiffs in trade secrets cases most often must rely upon "a web of perhaps ambiguous circumstantial evidence" of misappropriation rather than "convincing direct evidence." *Pepsi. Co., Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *15 (N.D. Ill. Jan. 2, 1996). Here, First Financial has produced circumstantial evidence that suggests Bauknecht's purported reasons for downloading the open loan documents are pretextual. Specifically, Bauknecht emailed himself the open loan documents on January 9, 2012, just one day before the Graymont Board voted to hire him, two weeks before he quit his job at First Financial, and fifteen days before he drafted the solicitation letter. Considering the substantial overlap between the Open Loans documents, the list of people to whom Bauknecht sent his solicitation letter, and the proximity of all of the events, a reasonable jury could conclude that Bauknecht relied upon the digital copies and therefore misappropriated the customer lists. *See id.*

constructive knowledge when it obtained information that is ordinarily kept confidential and that it should have realized originated with a competitor).

Graymont argues that it did not misappropriate First Financial's customer lists for the same reasons discussed above: First Financial has not produced evidence that it created the list of 73 using First Financial's customer lists. Graymont's argument regarding use falters for the same reason that Bauknecht's does: First Financial has produced evidence that Bauknecht possessed documents it asserts are trade secrets, produced circumstantial evidence that tends to show misappropriation, and also produced evidence sufficient to demonstrate that Bauknecht memorized names on First Financial's customer list. *See Rotec Industries, Inc. v. Mitsubishi Corp.*, 179 F. Supp. 2d 885, 894 (C.D. Ill. 1994) (granting summary judgment for the defendants when the plaintiff's only evidence of use was based on "unsupported speculation"); *Stampede*, 651 N.E.2d at 216.

In arguing that it did not use First Financial's customer lists, Graymont only obliquely raises an argument that it did not have actual or constructive knowledge that Bauknecht had misappropriated First Financial's trade secrets. And First Financial simply assumes that Graymont had actual or constructive knowledge, arguing that "Graymont misappropriated [customer information] by placing Bauknecht into a job in which it 'knew or had reason to know' that it was getting information because of a breach of confidence." (Doc. 109 at 52-53). However, First Financial has produced evidence sufficient to prove that Graymont had constructive knowledge that Bauknecht had misappropriated trade secrets. First Financial produced deposition testimony that suggests Graymont and Bauknecht discussed

moving over its customers, evidence that Graymont approved of Bauknecht's solicitation letter, and evidence that Graymont and Bauknecht both understood that customer identities and financial information is ordinarily confidential within the industry. Although this evidence does not indicate that Graymont had actual knowledge that Bauknecht breached a confidentiality agreement, *see RKI, Inc.*, 177 F. Supp. 2d at 868-69, it is enough to create a triable issue that Graymont had constructive knowledge that Bauknecht's information about customers was derived from a misappropriated trade secret. *See C&F Packing Co., Inc.*, 1998 WL 1147139, at *6-7. This, however, is not the only reasonable inference that a jury could draw. Because a past employee may solicit former customers provided there is no trade secret or confidentiality agreement, *see Delta Med. Sys.*, 772 N.E.2d at 785, a jury could conclude that Graymont acted under the assumption that Bauknecht was complying with the law.

### C. Damages

The third element in an ITSA case is damages. For the same reasons that Plaintiff's alleged breach of contract damages remains disputed, the issue of damages here remains in dispute as well.

Therefore, because Plaintiff has produced undisputed evidence that its customer lists and financial information were trade secrets and undisputed evidence that Bauknecht created customer lists for Graymont by memorizing the identities of First Financial's customers, summary judgment is granted on Plaintiff's motion with respect to Bauknecht's liability. There is a genuine dispute

as to the issues of damages and Graymont's misappropriation, which must be decided by the trier of fact.

## IV.    *Conversion*

Plaintiff alleges Bauknecht and Graymont converted its property. The elements of a conversion claim are that "(1) [the plaintiff] has a right to the property; (2) [the plaintiff] has an absolute and unconditional right to the immediate possession of the property; (3) [the plaintiff] made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998).

Plaintiff's complaint alleges that Bauknecht took with him "the Master Database and information from the targeted loan inquiries, as well as highly confidential business documents from First Financial, including, without limitation, business plans, strategic plans, and quarterly reports. In addition, Bauknecht took soil maps and farm equipment guides, which were the property of the bank." (Doc. 1 at 4). Plaintiff moves for summary judgment on three grounds.  First, it argues that Bauknecht's apparent admission makes him liable for conversion, second it argues that Bauknecht admitted to stealing farm equipment guides and returned them, and third it argues that Bauknecht admitted that he took First Financial's collateral schedules. In its opposition to Bauknecht and Graymont's motions to dismiss, it also alleges that Bauknecht converted its cell phone.

First, Plaintiff's conversion claim must be limited to the farm equipment guides, the soil maps, First Financial's collateral schedules, and other First

Financial documents in which it is not claiming a trade secret. Although Plaintiff has produced evidence that Bauknecht kept its cell phone even after it requested that he return it, there are no allegations that Bauknecht took a cell phone in the complaint. Plaintiff cannot move to amend its complaint "through arguments in [its] brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012).

Any claim that Bauknecht and Graymont took customer lists or financial information in which it is claiming a trade secret is preempted by the ITSA. This Court has previously concluded that the ITSA preempts any conversion claim based on conduct that misappropriates trade secrets and has held that "[t]he conversion of trade secrets would be preempted." (Doc. 24 at 9-10). First Financial now argues that the Court should allow its conversion claim to go forward with respect to certain specific customer lists and financial information if the Court or a fact finder determine that they are not trade secrets. Even if some of these customer lists and financial information do not qualify as trade secrets under the ITSA, any value that Plaintiff could claim in them is "dependent upon the existence of competitively significant secret information." *See Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005). Although plaintiffs are permitted to plead in the alternative, Plaintiff's conversion claim and its ITSA claim with respect to confidential information are not truly alternative because each claim rests upon the idea that its confidential information has unique value. Plaintiff should not be permitted to do an end-run around the ITSA in this case and present a conversion claim based upon competitively secret information if it cannot succeed in its ITSA claim. The Seventh

Circuit's decision in *Hecny* supports this conclusion. In *Hecny*, the Seventh Circuit held that the ITSA did not preempt claims for damages that were entirely independent of a trade secret claim, such as conversion of fax machines and a breach of fiduciary duty. *See* 430 F.3d at 404. Here, Plaintiff's conversion claim is not entirely independent of the ITSA claim as they relate to customer lists and financial information.

The Court grants Plaintiff's motion for summary judgment against Bauknecht with respect to the 2012 Farming Equipment Guides. Bauknecht has admitted that the 2012 Farming Equipment Guides belonged to First Financial's predecessor in interest, Freestar, and he returned the 2012 Farming Equipment Guides at his deposition. This undisputed evidence, therefore, establishes that Bauknecht converted First Financial's 2012 Farming Equipment Guides.

The Court grants Defendants' motion for summary judgment with respect to the soil maps. Bauknecht admits that he took soil maps from First Financial, but has presented undisputed evidence that the soil maps are his personal property. First Financial has attempted to dispute Bauknecht's claim of ownership by pointing to the so-called admission in his demand for indemnification. But Bauknecht's admission cannot carry First Financial that far. Even if a jury believes that Bauknecht admitted to all actions attributed to him in the complaint, the only action that the complaint attributes to him regarding the soil maps is the fact that he took them – something he already admitted to doing in his deposition. (*See* Doc. 1 at ¶ 18 ("In addition, Bauknecht took soil maps and farm equipment guides, which were the property of the Bank.")). Because First Financial has not presented

evidence that the soil maps were its property, summary judgment is granted for Defendants.

Defendants' motion is also granted with respect to the collateral schedule. First Financial's claim that Bauknecht converted the collateral schedule is supported only through cherry-picked parts of Bauknecht's deposition. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) (criticizing a party for "cherry-pick[ing] isolated phrases" from depositions as failing to "comport with the parties' duty of candor to the courts."). The sole evidence that First Financial provides to support the contention that Bauknecht converted its collateral schedule is from his deposition. In his deposition, Bauknecht admits that he modified a collateral schedule by crossing out the name "Freestar Bank" and handwriting in the name "State Bank of Graymont." He also admits that he crossed out other references to Freestar Bank throughout the collateral schedule and replaced them with references to Graymont. (Pl.'s Ex. 1, Doc. 111-1, at 276-277). However, he does not in his deposition admit to taking the collateral schedule from First Financial. Instead, he states that one of his customers provided him with the schedule. (*See id.* at 277-78).

First Financial has no evidence to the contrary. There is no reference to the collateral schedule in its Complaint, so it cannot rely upon Bauknecht's demand for indemnification. Because First Financial has failed to present evidence that Bauknecht misappropriated its collateral schedule, summary judgment is granted for Defendants.

If First Financial is not claiming that the documents that Graymont or Bauknecht have in their possession, including cash flow statements, financial reports, note modifications, mortgage extensions, and business loan agreements, are trade secrets, its conversion claim can proceed to trial. Graymont and Bauknecht have both disputed First Financial's claim of ownership. Graymont argues that many of Bauknecht's documents found on his Graymont computer are his personal financial statements and cash loan documents. And it presents evidence that it obtained some of the other business records through customers and other means. However, a reasonable jury could conclude that Bauknecht took at least some of the documents from First Financial. The documents are in Graymont's possession, and many of them have Bauknecht's name on them.

In conclusion, Plaintiff's motion for summary judgment is granted with respect to the Farm Equipment Guides. Defendants' motion for summary judgment is granted with respect to the soil maps and the collateral schedule, and granted with respect to all other items that Plaintiff asserts are trade secrets. The motions are denied in all other respects.

## V. *Computer Fraud & Abuse Act*

Plaintiff claims Bauknecht violated the Computer Fraud and Abuse Act ("CFAA") by knowingly and intentionally accessing Plaintiff's computers and therefore wrongfully obtaining Plaintiff's confidential information. Specifically, Plaintiff alleges that Bauknecht violated four subsections of the CFAA: 18 U.S.C. § § 1030(a)(2),(4)(5), and (b). Under the CFAA, individuals may not (1) intentionally access a computer without authorization or exceed their authorized access in order

to obtain "information contained in a financial record of a financial institution," 18 U.S.C. § 1030(a)(2); (2) "knowingly and with intent to defraud, access[ ] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct, further[] the intended fraud and obtain[] anything of value," *id.* § 1030(a)(4); (3) "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer;" *id.* § 1030(a)(5); or (5) "conspire[] to commit or attempt[] to commit an offense under subsection (a)." *Id.* § 1030(b).

To state a civil claim under the CFAA, a plaintiff must establish either damage or loss. *See* 18 U.S.C. § 1030(g) (creating private right of action for any person "who suffers damage or loss by reason of a [CFAA] violation."); *Motorola, Inc. v. Lemoko Corp.*, 609 F. Supp. 2d 760, 766 (N.D. Ill. 2009) (construing section 1030(g) to require damage or loss rather than damage and loss). Both damage and loss are defined by the statute in a way that departs from their ordinary meaning.

Plaintiff's CFAA claims take on a number of flavors. First, Plaintiff moves for summary judgment on the ground that Bauknecht violated the act when he accessed and downloaded the master database and when he used Plaintiff's computers to conduct targeted inquiries into customer loans. Second, Plaintiff opposes Bauknecht's motion for summary judgment on the ground that Bauknecht used its computers in an unauthorized way and created an interruption of service when he stole and then disposed of its smartphone and failed to disclose his voicemail password. Such a theory does not appear in the Complaint and is announced for the first time in Plaintiff's response.

Although they are not well-delineated, Bauknecht makes two major arguments in support of his motion for summary judgment. First, he argues that the misappropriation of trade secrets alone does not constitute damage under the statute. Second, he argues that Plaintiff cannot establish loss as defined by the statute.

### A. Unauthorized Access

Plaintiff argues that Bauknecht violated the CFAA when he created his master database and accessed customer lists and other confidential information that were located within its computer system. There may be some merit to such a claim. The Seventh Circuit has held that employees' authorization to access employer computers terminates when employees breach a duty of loyalty. *See Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006). Because Plaintiff's fiduciary duty claim cannot be resolved on summary judgment, it is premature to determine whether Bauknecht's access was unauthorized. *See id.* This is beside the point, however. As explained below, Plaintiff has not established "damage or loss" exceeding $5,000 as defined by the statute. *See* 18 U.S.C. § 1030(g) (requiring plaintiff prove conduct involving at least one statutory factor, which includes "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value. . .").

### B. Damage

Plaintiff has not presented evidence that Bauknecht caused it damage under the CFAA. Plaintiff argues it was damaged when Bauknecht exceeded his authorization to access its computer network and took its confidential information.

However, Plaintiff presents no evidence that Bauknecht removed, deleted, altered, destroyed, corrupted, or otherwise diminished the completeness or usability of its data. Such an allegation is required to establish damage under the CFAA.

Under the CFAA, damage has a specific and particular definition. It is "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8); *see also Citrin*, 440 F.3d at 419 (defining damage to include both impairment of hardware and stored files). "[T]he cardinal rule of statutory interpretation is that courts must look first to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose." *United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunitions*, 376 F.3d 709, 712 (7th Cir. 2004). District courts have relied on the CFAA's statutory language to limit CFAA damages to "destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system." *Farmers Ins. Exchange v. Auto Club Group*, 823 F. Supp. 2d 845, 852 (N.D. Ill. 2011). "The mere copying of electronic information from a computer system is not enough to satisfy the CFAA's damage requirement." *Id.* In *Motorola, Inc. v. Lemko Corp.*, the district court dismissed certain CFAA claims, noting that "[t]he CFAA's definition of damage does not cover [the disclosure to a competitor of its trade secrets and other confidential information]," because "the plain language of the statutory definition refers to situations in which data is lost or impaired because it was erased or because (for example) a defendant smashed a hard drive with a hammer." 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009).

In this case, all Plaintiff has alleged Bauknecht did is access documents to which he had no right. He did not delete or corrupt those files, as the employee in *Citrin* was alleged to have done. *See* 440 F.3d at 419. For that reason, any argument that Bauknecht caused damage as defined by 18 U.S.C. § 1030(e)(8) is untenable.

### C. Loss

In its response to Bauknecht's motion, Plaintiff does not appear to contest the lack of statutory damage, and instead argues that Bauknecht's actions have caused it loss in the form of "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Plaintiff makes two arguments: first, it argues that it does not need to establish an interruption of service and can establish statutory loss by simply showing lost profit as a result of Bauknecht's unauthorized access. Second, it argues that Bauknecht caused an interruption of service by refusing to return his work-issued cell phone or disclose his voicemail passcode.

The statute and law are clear: in order to establish loss through lost revenue, a plaintiff must establish an interruption in service. "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information or its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damage incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Therefore, there are two categories of statutory loss: expenses incurred while responding to or investigating a violation, and costs incurred, or revenue lost, because of a service disruption. *See id.*; *see also SKF USA, Inc. v. Bjerkness,* 636 F.

Supp. 2d 696, 721 (N.D. Ill. 2009); *Quantlab Techns. Ltd v. Godlevsky*, 719 F. Supp. 2d 766, 776 (S.D. Tex. 2010); *Nexan Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 472 (S.D.N.Y. 2004), *aff'd* 166 F. App'x 559, 562-63 (2d Cir. 2006). Some courts have made it even more difficult for plaintiffs to establish loss under the CFAA, and have conditioned recovering investigative costs on an interruption of service. *See, e.g., Cassetica Software, Inc. v. Computer Science Corp.*, No. 09-C-0003, 2009 WL 1703015, at *4 (N.D. Ill. June 18, 2009).

Plaintiff relies upon *C.H. Robinson Worldwide, Inc. v. Command Transportation, LLC* for the proposition that plaintiffs can recover for lost revenue without proving an interruption of service. *See* 05-C-3401, 2005 WL 3077998, at *3 (N.D. Ill. Nov. 16, 2005). However, *C.H. Robinson Worldwide* is not persuasive in this context. There, the court refused to dismiss a CFAA case, concluding that a commercial logistics service provider properly alleged loss by pleading both the "loss in value of trade secrets . . . and confidential information that was not previously known to the public" and "the loss of competitive advantage." *C.H. Robinson* does not analyze the statutory definition of loss, and instead relies upon outdated authority that interpreted an earlier version of the CFAA that did not define the term. *See id.* (relying upon *Pacific Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195 (E.D. Wash. 2003)); *CoStar Realty Information, Inc. v. Field*, 737 F. Supp. 2d 496, 514 (D. Md. 2010) (explaining that *Pacific Aerospace* is "based on another case that explicitly interpreted the term 'loss' under its ordinary meaning because the CFAA statute had not yet defined the term."). For that reason, the

Court rejects Plaintiff's argument that lost revenue need not be premised on interruption of service.

Plaintiff makes a last-ditch effort to save its CFAA claim by arguing that Bauknecht caused an interruption of service by refusing to return his cell phone and later disposing of it. The Court need not consider this argument. In its complaint, Plaintiff premises its CFAA claim on Bauknecht's unauthorized access of confidential information and his use of such information. There are no allegations that Bauknecht created an interruption of service, nor is there any indication that Plaintiff's CFAA claim is premised on an interruption of service. Plaintiff cannot move to amend its complaint "through arguments in [its] brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012). Moreover, the Court is skeptical of Plaintiff's claim that it lost revenue as a result of an interruption in service. If anything, Plaintiff's lost revenues appear to be attributable to Bauknecht's outreach to Plaintiff's former customers. *See CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 998 (N.D. Ill. 2011) (holding that lost revenues unrelated to the impairment of a computer system, including lost sales, are not recoverable under the CFAA). Plaintiff argues that Bauknecht created an interruption in service and that it lost revenue, but it fails to connect the two phenomena other than through conjecture that it could have retained customers if Bauknecht had not kept the phone.

For these reasons, Plaintiff's motion for summary judgment on Count V is denied and Bauknecht's motion for summary judgment on Count V is granted.

## VI.    *Tortious Interference with Contract against Defendant Graymont*

In Count VI, First Financial alleges that Graymont tortuously interfered with its confidentiality agreement with Bauknecht. Both Graymont and First Financial have moved for summary judgment on the claim.

To succeed in a claim of tortious interference, First Financial must prove (1) that there was a legally enforceable contract of which Graymont had knowledge, (2) that Graymont intentionally interfered with the contract and induced a breach by a party to the contract, and (3) that the breach resulted in damages. *TABFG, LLC v. Pfeil*, 746 F.3d 820, 823 (7th Cir. 2014)(rehr'g denied May 23, 2013).

In its motion, the only evidence that First Financial provides is the apparent admissions contained in Bauknecht's indemnification letter. Because Graymont never adopted the apparent admission included in the letter, and because the letter is inadmissible hearsay evidence that cannot be used against Graymont, First Financial's motion for summary judgment is denied.

In its motion, Graymont argues that First Financial has not provided any proof that it knew about Bauknecht's confidentiality agreement prior to August 2012. First Financial has three rejoinders: first, it attempts to rely upon the inadmissible indemnification letter. Second, it argues that Graymont's argument is unbelievable because Graymont has a similar agreement in place. Third, it argues that Graymont's argument is unbelievable because of the Gramm Leach Bliley Act and the Illinois Banking Act.

Neither of First Financial's second two rejoinders succeeds. The fact that Graymont requires its employees to sign a confidentiality agreement is not proof

that Graymont had knowledge of Bauknecht's old confidentiality agreement; it is proof that Graymont knew that Bauknecht signed a confidentiality agreement with it.

Similarly, Graymont's knowledge of federal and state laws pertaining to financial institutions' legal requirements to keep customer information confidential cannot prove that Graymont had knowledge of Bauknecht's confidentiality agreement. Neither law requires that financial institutions have their employees sign confidentiality agreements. *See* 15 U.S.C. § 6801; 205 Ill. Comp. Stat. 48.1(c). Moreover, it is unclear that either law would prohibit banks from sharing most of the information that First Financial claims Bauknecht shared with Graymont. The Illinois Department of Financial and Professional Regulation has made it clear that the Illinois Banking Act does not prohibit the disclosure of customer lists. *See* State of Illinois Dep't of Fin. and Prof. Reg., Interpretive Letter No. 01-01, 2001 WL 36286522 (March 9, 2001) ("Section 48.1 of the Act contains no specific statutory provision governing the sharing of customer lists by banks."). And the Gramm Leach Bliley Act does not apply to a customer list that "contains only publicly available information" that "is not derived in whole or in part using personally identifiable financial information that is not publicly available." 12 C.F.R. § 332.3(n)(3)(ii). Information is publicly available "if an institution has a reasonable basis to believe that the information is lawfully made available to the general public from government records . . . includ[ing] in a telephone book or a publicly recorded document, such as a mortgage or securities filing." Fed. Dep. Ins. Corp., FDIC

Compliance Manual VIII-1.2 (Jan. 2014), *available* at https://www.fdic.gov/regulations/compliance/manual/.

Because First Financial has not presented evidence that Graymont knew of the confidentiality agreement before Bauknecht breached it, it has not provided evidence sufficient to prove that Graymont tortuously interfered with the contract. Therefore, Graymont's motion for summary judgment on this count is granted.

## VII.    *Tortious Interference with Prospective Economic Advantage Against Both Defendants*

All parties have moved for summary judgment on Count VII. To succeed in a claim for tortious interference with prospective economic advantage, a plaintiff must prove (1) that it had a reasonable expectation of entering into a valid business relationship, (2) that defendant knew of this reasonable expectation, (3) that defendant's purposeful interference prevented its legitimate expectancy from ripening into a valid business relationship, and (4) damages. *Felhauer v. City of Geneva*, 568 N.E.2d 870, 877-78 (Ill. 1991).

First Financial has alleged that Bauknecht made misrepresentations to one of its elderly customers, Bill Livingston, who then moved his account to Graymont because of this misrepresentation.

In First Financial's motion for summary judgment on Count VII, it relies entirely upon the purported admission contained in Bauknecht's indemnification demand. For reasons discussed above, the admission is inadmissible against Graymont and merely serves as disputed evidence against Bauknecht. For that reason, First Financial has failed to present undisputed evidence sufficient to prove

that Defendants tortiously interfered with its prospective economic advantage. Its motion for summary judgment is denied.

Defendant Graymont's motion for summary judgment on Count VII is granted. Graymont argues that First Financial has failed to present evidence sufficient to support the claim in count VII. First Financial responds with two pieces of evidence: the apparent admission, and the testimony of First Financial employee Dustin Smith.

As discussed earlier, the apparent admission is not admissible against Graymont. Smith's testimony does not help Plaintiff either. In his deposition, Smith testified that Bill Livingston told him that Bauknecht had misrepresented to him things about First Financial's products. (Smith Dep., Doc. 106-6, at 203-204). Smith learned of each of the details about what Bauknecht apparently said through Livingston. (*See id.* at 209 (Livingston "just told me Scott told him that.")).

First Financial relies upon this testimony for proof that Bauknecht purposely interfered with its business relationship with Livingston. However, the evidence is inadmissible hearsay, as Smith's testimony depends upon the truth of Livingston's assertion to him: that Bauknecht made certain comments to him. *See* Fed. R. Evid. 801(c)(2).

Smith's testimony relies upon two separate sets of statements: the first is Bauknecht's statements to Livingston, the second is Livingston's statements to Smith. If First Financial had presented deposition testimony or an affidavit from Livingston, then it might have survived summary judgment on this claim, as Bauknecht may have made his comments as a Graymont employee in the scope of

his employment. *See* Fed. R. Evid. 801(d)(2)(D). However, First Financial has not presented evidence from Livingston. Instead, it has presented evidence from Smith. Livingston's comments to Smith are not subject to any of the hearsay exceptions included in the Federal Rules of Evidence. *See Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (granting summary judgment for defendant on defamation claim because only available evidence had multiple layers of hearsay).

First Financial attempts to rehabilitate its evidence by arguing that it does not depend upon the truth of Bauknecht's statements, and that it is "enough that the statements . . . were made, and they're admissible not for the truth of any matter asserted but because they explain what prompted the elderly customer to leave." (Doc 121 at 58). First Financial ignores that it must depend upon hearsay evidence – Livingston's words as told through Smith – to establish that Bauknecht even made comments to begin with. Without Livingston, Plaintiff can't even get to Bauknecht's comments. *See* Fed. R. Evid. 801(c)(2). Graymont's motion for summary judgment on this count is granted.

Bauknecht's motion for summary judgment is denied. Although First Financial's admissible evidence on Count VII against Bauknecht is quite thin – a letter seeking indemnification that qualifies as a statement of a party opponent under Federal Rule of Evidence 801(d) – it is enough to create fact disputes and preclude summary judgment for Bauknecht.

### VIII.    *Civil Conspiracy Against Both Defendants*

To succeed in a civil conspiracy claim, a Plaintiff must produce evidence of "(1) an agreement between two or more person to accomplish either an unlawful

purpose or a lawful purpose by an unlawful means; and (2) at least one tortious act by at least one of the conspirators in furtherance of the agreement." *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1110 (N.D. Ill. 2012). Plaintiff's complaint alleges that Defendants entered into a conspiracy to commit each of Counts I through VII.

### A. First Financial's Motion

First Financial's motion for summary judgment must be denied, as it relies upon the apparent admission that "[a]ll actions attributed to Bauknecht in the complaint were either known to or authorized by appropriate officers of the State Bank of Graymont." As with every other count, Plaintiff over-relies upon the apparent admission.

First, as discussed above, such an admission can at most be attributed to Bauknecht and cannot be attributed to Graymont. This is true even for the purpose of a conspiracy claim, because the apparent admission was made after litigation had been filed, on December 27, 2012, and it has nothing to do with the furtherance of any purported conspiracy between the two. *See* Fed. R. Evid. 801(d)(2)(E) (requiring that statement offered against an opposing party that was made by party's coconspirator be made during and in furtherance of the conspiracy). Therefore, the letter is not admissible evidence against Graymont for purposes of the conspiracy charge.

Second, the letter hardly admits to any sort of conspiratorial agreement. At best, as proof against Bauknecht, it shows that Graymont knew about certain of his actions and authorized certain of his actions. It in no case specifies whether

Graymont agreed to particular actions that were required in furtherance of a conspiracy. Further, any acts that Graymont authorized are irrelevant to a conspiracy claim. The only acts that Graymont could have authorized are acts that Bauknecht engaged in while an employee or agent of Graymont. And, there can be no conspiracy between a principal and an agent. *See Buckner v. Atlantic Plaint Maintenance, Inc.*, 694 N.E.2d 585, 602 (Ill. 1998).

Therefore, the only mileage that Plaintiff can get from the apparent admission is evidence to be used against Bauknecht that Graymont knew about his actions. This does not go very far on a conspiracy claim. Plaintiff's motion is denied.

### B. Defendants' Motions

The Court grants Defendants' motions with respect to the conspiracy count. The Court considers the conspiracy count claim-by-claim.

### 1. Breach of Contract

A claim for a conspiracy to breach a contract depends upon one party breaching its contract and the other party inducing that party to breach. *See Blivas v. Klein*, 282 N.E.2d 210, 213 (Ill. App. Ct. 1972) ("While it is true that a party cannot be sued in tort for inducing the breach of his own contract, he can be sued for conspiracy with a third person who has induced him to breach his contract resulting in actual damage."). In this case, Plaintiff has established that Bauknecht breached his confidentiality agreement. However, it has not provided sufficient evidence to go to trial on its tortious interference with contract against Graymont. Therefore, it has not presented evidence sufficient to support a conspiracy claim based on Bauknecht's breach of contract. *See Blivas*, 282 N.E.2d at 213.

## 2. *Breach of Fiduciary Duty*

Plaintiff has produced sufficient evidence to get to a trial on the matter of Bauknecht's breach of a fiduciary duty. As explained above, to succeed on a fiduciary duty claim, Plaintiff must show that Bauknecht began to improperly compete against it while he was still a First Financial employee or that he took actions to compete against it while he was still a First Financial employee.

However, Plaintiff cannot point to any evidence on the record that suggests Defendants entered into an agreement regarding this activity. The only evidence that Plaintiff presents is testimony from Bauknecht and Graymont's president Ron Minnaert that they discussed the possibility of Bauknecht bringing First Financial accounts with him. Even if the Court ignores Bauknecht and Graymont's dispute over the characterization of that testimony and assumes that the two expressly agreed that Bauknecht would attempt to move over First Financial customers, it is not enough to save Plaintiff's conspiracy claim here. Rather, Plaintiff would need to point to evidence of an agreement that Bauknecht would take steps prior to his start date with Graymont. *See Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1059 (Ill. App. 1993).

All evidence of agreement points to actions that Bauknecht was to take subsequent to Graymont hiring him. Therefore, Defendants' motion for summary judgment on the conspiracy claim as it relates to Bauknecht's breach of fiduciary duty is granted.

### 3. ITSA

Plaintiff's conspiracy claim as it relates to the ITSA is preempted by the ITSA because the underlying activity giving rise to its conspiracy claim is identical to the underlying activity giving rise to its ITSA claim. *See Abanco Int'l v. Guestlogix, Inc.*, 486 F. Supp. 2d 779, 782 (N.D. Ill. 2007). Plaintiff argues that the Court is foreclosed from concluding that its conspiracy cause of action is preempted based on the law of the case. Plaintiff is correct that the Magistrate Judge denied Defendants' motion to dismiss count VIII, concluding that the conspiracy claim was based on alleged wrongful conduct that is unrelated to the misappropriation of trade secrets. (Doc. 24 at 10-11). Then, just as now, Plaintiff's conspiracy claim rested on the tortious conduct underlying each of its other counts, not just the ITSA claim. Therefore, it is not inconsistent with this Court's prior decisions to conclude that the conspiracy count is preempted insofar as it rests on conduct covered by its ITSA claim. Because case law is clear that the ITSA preempts conspiracy claims that are based upon the misappropriation of trade secrets, Defendants' motion is granted with respect to any conspiracy to misappropriate trade secrets.

### 4. Conversion

Although parts of Plaintiff's conversion claim can proceed to trial, Plaintiff has not provided evidence that Defendants entered into an agreement to convert its property. Although it has presented some evidence that suggests Defendants agreed that Bauknecht would bring customers with him from First Financial, such an agreement relates to Plaintiff's preempted ITSA claim and is unrelated to Plaintiff's conversion claim.

### 5. Computer Fraud

Because the Court has granted summary judgment against Plaintiff on the CFAA count, its conspiracy count as it relates to the CFAA cannot succeed. Plaintiff cannot show that either party committed a tortious act in furtherance of the conspiracy. *See   U.S. Data Corp.*, 910 F. Supp. 2d at 1110.

### 6. Tortious Interference with Contract

Because the Court has granted summary judgment against Plaintiff on the tortious interference with contract count, its conspiracy count as it relates to tortious interference with a contract cannot succeed. Plaintiff cannot show that either party committed a tortious act in furtherance of the conspiracy. *See id.*

### 7. Tortious Interference with Prospective Economic Advantage

The court has granted summary judgment for Graymont on Plaintiff's Tortious Interference with Prospective Economic Advantage, but denied Bauknecht's motion due to the unfortunate language in the indemnification letter. However, the conspiracy count does not just, ipso facto, follow. Rather, it fails because the only allegations of tortious interference with prospective economic advantage relate to Bauknecht's alleged activity after Graymont employed him. Because he was, at that point, Graymont's agent, there can be no conspiracy charge. *See Buckner*, 694 N.E.2d at 602.

## CONCLUSION

IT IS THEREFORE ORDERED:

1. Defendant Graymont's Motion to Overrule Objections and Allow Use of Answers and Admissions (Doc. 98) is GRANTED IN PART and DENIED IN PART.

2. Plaintiff First Financial's Motion for Summary Judgment (Doc. 108) is GRANTED IN PART and DENIED IN PART. The motion is granted in part with respect to Counts I, III, and IV, but otherwise denied.

3. Defendant Graymont's Motion for Summary Judgment (Doc. 107) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Counts VI, VII, and VIII, granted in part with respect to Count IV, and otherwise denied.

4. Defendant Bauknecht's Motion for Summary Judgment (Doc. 104) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Counts V and VIII, granted in part with respect to Count IV, and otherwise denied.

Entered this <u>24th</u> day of October, 2014.


s/Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
